UNITED STATES *v.* KLIPSTEIN & Co. (No. 1117).[1]

GREASE, NOT SPECIFICALLY PROVIDED FOR.

> The legal effect of paragraph 580, tariff act of 1909, is to .ast upon importers the burden of establishing not only that the oil imported is fit for the uses therein enumerated, but that it has no practical commercial fitness for other uses than those named. Stone & Downer Co. *v.* United States (4 Ct. Cust. Appls. 47; T. D. 33266), There is here a clear preponderance of proof of the Government's contention that the grease of the importation was not so limited in its use.

United States Court of Customs Appeals, December 15, 1913.

APPEAL from Board of United States General Appraisers, Abstract 29103 (T. D. 32681). Abstract 31415 (T. D. 33217).

[Reversed.]

*William L. Wemple,* Assistant Attorney General (*Charles D. Lawrence,* assistant attorney, on the brief), for the United States.
*Brown & Gerry* for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The importation in question in this case was returned for duty by the appraiser as grease, not specifically provided for, at 25 per cent.

ad valorem. It was claimed by the importer to be free from duty under paragraph 580 of the tariff act of 1909, under the provision for—

Grease, fats, vegetable tallow, and oils  *  *  *  such as are commonly used in soap making or in wire drawing, or for stuffing or dressing leather, and which are fit only for such uses,.and not specially provided for.

The question presented on this appeal is whether the presumption arising from the action of the appraiser and collector in listing this importation as subject to duty under paragraph 3 has been overcome by the testimony offered on behalf of the importer not disproved by that of the Government.

In Stone & Downer Co. *v.* United States (4 Ct. Cust. Appls., 47; T. D. 33266) it was held that the legal effect of the provisions of paragraph 580 is to cast upon the importers the burden of establishing not only that the oil imported is fit for the uses therein enumerated, but that it has no practical commercial fitness for other uses than those named. The importers assumed this burden in the present case and called three witnesses. The first was John H. Yocum, who was a chemist by profession, but also engaged in the leather business. His testimony was to the effect that grease of the character of that here involved was used for stuffing and dressing leather. He was asked:

Q. Please state for what purpose you have used it and seen it used.—A. I have used it for the purpose of mixing in the grease used for stuffing harness leather, belting leather, upper leather, and shoe leather.

Q. Is that the only use, that of mixing with other greases for stuffing leather, that you have known the article to be applied to?—A. That is all I have known it to be applied to.

Q. Now, basing your answer upon your quantitative and qualitative analyses and upon your practical and chemical experience, please state whether you know of any other uses to which the merchandise could be put than that to which you have testified.—A. I don't know of any purpose to which it could be—of any use to which it can be put successfully.

Q. I mean practically, as a business proposition.—A. Yes, successfully; yes.

He further testified in answer to the question, "And your experiments have been conducted for determining any other possible practical use, whether there are any other practical uses ?" by saying:

Well, I can't say that I have carried on experiments to determine whether it can be used in other industries. All I can say is that so far as I know it is not used. You could not use it in the candle industry, because the high percentage of fatty acids present which would occasion—which do occasion as a matter of fact—very acrid odors, would prevent its use there. You can not use it for stiffening tallows on account of the high free fatty acids when they sell tallow on a minimum of free fatty acids.

He also expressed the opinion that it could not be used for dressing wools or for soap making on account of its smell.

Another witness called for the importer was Charles L. Burton, who testified that he was a commission merchant in greases and oils; that he was familiar with the article and had personally bought and

sold it, and had been familiar with it for six or seven years, and that the uses to which it is put are for leather stuffing; that he had sold it for that purpose; that he knew of no other use. In answer to the question, "So that you don't know actually whether they use it for stuffing leather or oiling machinery?" he replied: "Unless by common repute."

The importers also produced one E. Deutz, who testified that he was connected with the importers and engaged in selling articles corresponding to those imported in the present case and had been for five or six years, and when asked if he knew the uses to which it had been put during that period replied that he knew of one use.

Q. Only one use?—A. Yes, sir.
Q. Is there only one use you know of?—A. Yes, sir.
Q. What is that use?—A. Stuffing leather.

On cross-examination he was asked:

Q. Have you ever sold any of this merchandise to manufacturers of rouges or polishing powders?—A. No, sir.
Q. Do you have any dealings with people of that class anyway?—A. Yes, we have.
Q. Do you sell them a grease for that purpose?—A. No, sir.
Q. Have you ever tried to sell this so-called stearin to rouge manufacturers?—A. No, sir.

The Government then took the case and offered testimony of witnesses which tended to show that such greases as those here involved had been sold for manufacturing rouges for jeweler's use, one witness testifying that he had been receiving continuous orders from jewelry houses for two years or more for such merchandise, and that it also was sold to leather-belt manufacturers, and was further sold to manufacturers of Putz pomade, which is used for cleaning; that his sale to jewelry supply houses amounted to two or five cases at a time, and that in the course of five years he had imported in all about 100 cases; that pretty nearly all of this, with the exception of two cases sold to Putz pomade people, had been sold to the jewelry supply houses for the purpose indicated. The Government also produced E. Reid Burns, who testified that he used material similar to that involved in preparing polishing supplies; that the material looks exactly like it, smells like it, has the same color and the same consistency, and is, in his judgment, unquestionably adapted to the same uses. And in answer to questions by importers' counsel as to whether he would buy a lot like the exhibit in question without further examination, he replied that he would, and buy on the strength of what he had seen in the samples, and that he was quite sure it would be useful to him for making polishing paste; that he had used varying quantities, beginning in 1900 with 1,300 to 1,400 pounds a year, and in 1911 about 1 ton; and that he was using some at the time his testimony was given.

The Government also called Thomas Newsome, who was a dealer in dyestuffs, chemicals, and oils, residing in Boston. He testified that he had had 20 years' experience in dealing in this line of goods; that he was familiar with wool-grease stearin; that he used it himself in his own works for a water resist on animal or vegetable fibers to give a fiber a power to resist water; that he had also used it for giving a water resist for mineral fibers, such as asbestos; that he had sold it for softening size for sizing cottons; and that these uses were substantial. He also testified that it was used for stuffing leather and was largely used for that purpose. He did not know the extent. He had also seen it used and had used it in his own mills and factories as a belt grease; that is, to keep the belt biting on the pulley; that when used as a water resist it was used in connection with other materials, but when used for a belt grease it was used in the form in which imported.

The Government also produced Herbert Gardner McKerrow, who testified that such material as is here involved had been used for stuffing leather and for belt dressing; that it was also used as a base for brass polish; that these uses were within his observation and knowledge; that it was also used for thickening oils quite extensively; that he had sold it for all these purposes; and that the article has substantial uses along those lines, within his knowledge; that he had sold it to a man who used it extensively for metal polish. He also stated in answer to the question:

Are you prepared to say whether in the adulteration of tallow or thickening of oils, or in belt dressing, or in the use in the manufacture of metal polishes the article is used in the condition in which it appears here before us or whether it is mixed or has a process applied to it to fit it for the ultimate uses which you have described?— A. I should say in the majority of cases it is mixed. I understand it is also mixed for softening leather.

The statement that the goods are mixed with other ingredients to use for stuffing leather agrees with the testimony of importers' witness Yocum. There was no direct contradiction of the testimony of the Government's witnesses that the grease in question is used for metal polish, for instance, and for belt grease, and by jewelers in the manufacture of rouge. The Government's testimony tends to show that the grease in question is used for these purposes and that the uses are substantial. We think this testimony was sufficient to overcome the testimony offered by the importers. It is true the testimony of the importers was sufficient to make a prima facie case, but the negative testimony which they offered was met by affirmative testimony showing specific uses, and importers rested their case without meeting by further testimony this affirmative convincing proof.

We feel constrained, therefore, to hold that the very clear preponderance of proof in this case is with the Government and that as to the points covered it is not controverted by any persuasive testimony.

The decision of the board is *reversed*.